THE SECOND MUNICIPALITY OF NEW ORLEANS *v.* THE ORLEANS COTTON PRESS COMPANY.

Under an ordinance of the Council of the Second Municipality of New Orleans, which had been in force for several years, a fixed annual tax was levied on the assessed value of the real estate within the Municipality. In the month of December it was ascertained that the revenues of the Municipality would be insufficient to discharge its debts ; and an ordinance was passed laying an additional tax for the year ending with that month, and for the succeeding year. In an action to recover the increased tax for the year just expiring : *Held*, that no period of the year being fixed by law when the tax shall be laid, the retrospective operation of the ordinance is no proof of its illegality.

The fifth section of the act of 10th March, 1834, relative to the powers of the Mayor and City Council of New Orleans, and the ordinance of the Second Municipality of that city, of December, 1838, require a notification to the tax payer, before he can be made liable for interest at the rate of eight per cent a year, on the taxes due by him. Where he has not been put in default, interest can be recovered only from judicial demand.

APPEAL from the Commercial Court of New Orleans, *Watts,* J.

*Rawle,* for the plaintiffs.

*R. N.* and *A. N. Ogden,* for the appellants.

GARLAND, J. This is a claim for municipal taxes levied on the landed estate of the Company, being $600 for the year 1838, the like amount for the year 1839, and the sum of $1500 for the year 1840, with interest at eight per cent per annum, on each of these sums, from the time they became due or demandable.

The answer is a general denial.

It is admitted, that since the institution of the suit, each of the sums of $600 has been paid, leaving the question of interest open for decision, by consent of parties. The Court gave a judgment for $1500, with interest thereon at eight per cent per annum, from the 1st of January, 1841; and allowed the like interest on one of the sums of $600 from the 1st of January, 1840, until paid, saying nothing about the interest on the other sum of $600, alleged to have been due on the 2d January, 1839. From this judgment the defendants have appealed.

It is alleged, in the first place, that the plaintiffs cannot recover more than $600 for the taxes of the year 1840, and that the ordinance passed on the 15th of December, 1840, laying an additional tax of three dollars on every one thousand dollars of the assessed value of real estate for the years 1840 and 1841, is, so far as it relates to the year 1840, retroactive, unauthorized, and contrary to law.

The power of the Municipal Council to lay taxes on lands and slaves within its limits, is, we suppose, unquestionable. This power seems not to have been denied; and no law is shown to have existed, at that time, which limited the discretion in the exercise of the power. An ordinance had existed for a number of years, laying an annual tax of two dollars on each thousand dollars, of the assessed value of real estate within the limits of the corporation, with certain exceptions. Under this ordinance the tax of $600 for the years 1838 and 1839 was claimed, and the justice of the demand is not denied, so far as regards the principal; nor is it denied that $600 of the tax of 1840 is due under the same ordinance. It is proved that in the month of December, 1840, there was a deficiency in the funds of the Municipality, its debts exceeding its yearly income. The Council thereupon passed an ordinance laying an additional tax as above stated, whereby the taxes on the property of the defendants were increased from six to fifteen hundred dollars. It is this increase on the taxes of the year 1840 that is resisted.

The power to levy a tax is undeniable; no limitation of the power is shown; nor does it appear, that any period of the year is fixed at which the tax shall be laid. Towards the close of the

year 1840, the Council finding the revenue of that year and the succeeding one, insufficient to pay the debts and future expenses of the municipal government, levied an additional tax, which is alleged to be retroactive, illegal, and contrary to the original and fundamental principles of a free government. What these last have to do with the question, we do not well understand. Taxation, as we understand it, is an arbitrary power, to be exercised when expedient, and is indispensable to the preservation of the faith and credit of states, and municipal corporations. The advocates of civil liberty have contended, that it should be inseparable from representation, and uniform in its operation; and it does not appear, that either of those principles has been violated in the case before us. As to the alleged retrospective operation of the ordi·nance, we think the argument is fully met, and refuted, by the opinion given in the case of *Oakey* v. *The Mayor et al.* 1 La. 1, which was written by one of the most distinguished jurists of our State and country, whose recent decease has caused universal regret.*

---

* The late ALEXANDER PORTER. The subjoined notice of the death of this gentleman, appeared in the Bulletin newspaper of the 31st of January, 1844, from the pen of JUDGE BULLARD, who succeeded, in January, 1834, to the seat on the bench of the Supreme Court left vacant by the resignation of Judge PORTER.

OBITUARY.

A wide void has been created by the death of ALEXANDER PORTER. One who has known him intimately during the greater part of his brilliant career, who admired his genius and his energy of character, and who, in common with the rest of the community, sincerely laments its untimely termination, cannot permit the occasion to pass away without putting upon record his testimony of his worth, not in the common place language of indiscriminate eulogium, but in terms dictated by truth and candor.

The subject of this notice was born in Ireland, in 1785, and consequently was but a boy when the same political calamities which drove an EMMETT and a SAMPSON, and many others, to our shores, deprived him of a father and a country. He sought refuge from the storm, and found a home in the United States. He was at first destined to mercantile pursuits; but fortunately was permitted to follow the bent of his own inclination, and, with an early education somewhat neglected, he embraced the profession of the Law. Having prepared himself for admission to the bar in Nashville, where he had resided

The Second Municipality of New Orleans v. The Orleans Cotton Press Company.

In the second place it is contended that the court erred, in allowing interest on the sums claimed by the plaintiffs at the rate of eight per cent per annum from the time specified.

since his arrival in America, he came to Louisiana in 1810. He settled himself in Attakapas ; and such was the energy of his character, and the charm of his manners and conversation, that in a parish peopled at that time almost exclusively by inhabitants of French origin, and speaking only that language, he was elected two years afterwards a member of the Convention which formed the present Constitution of this State. He was one of its most active and distinguished members ; and many of his efforts, in which he put forth the most glowing and fervent eloquence, are yet remembered by the survivors of that body.

We have said, that the early education of Mr. PORTER was imperfect. After he commenced the practice of the law in this State, by a constant persevering self-culture, he made himself sufficiently acquainted with Latin, French, and Spanish, to gain access to all the treasures of legal learning. It must not be forgotten, that at that time the Spanish law was in force in Louisiana, coexisting with a code in itself imperfect, and calculated to bewilder the researches of the student and the practitioner. He made himself so well acquainted with the Spanish Law and its history, as to furnish that analysis of the Spanish Codes or positive law, which is to be found in the appendix of one of the volumes of Wheaton's Reports.

From 1810 till 1820 the range of practice of Mr. PORTER embraced the counties of Attakapas, Opelousas, and Rapides. He was always distinguished, not only for the enthusiasm and ardor of his character, and his impassioned eloquence, but for the joyous hilarity of his conversation in society ; always replete with humor, wit, and anecdote, " which set the table on a roar." Such a combination of qualities gave him, not only extensive popularity, but great influence, throughout that district.

On the retirement of Judge DERBIGNY, in 1820, Mr. PORTER was appointed his successor as one of the Judges of the Supreme Court of this State. His appointment, though a very young man, gave general satisfaction to the profession. From that time until the end of the year 1833, the Supreme Court was composed of GEORGE MATTHEWS, whose sound judgment, unerring sagacity, and instinctive sense of equity, were universally admitted ; of FRANÇOIS XAVIER MARTIN, the only survivor—the Nestor of our jurisprudence, equally distinguished for singular acumen and extensive and varied learning—and ALEXANDER PORTER.

It was a period remarkable in our judicial annals, in the course of which the law itself underwent great changes, by the amendments of the Civil Code and the enactment of the Code of Practice, and the final abrogation of the Spanish law, in 1828. These changes added much to the labors of the Bench ;

JANUARY, 1844.                                    415

The Second Municipality of New Orleans v. The Orleans Cotton Press Company.

The fifth section of the act of the Legislature, passed in 1834, explaining the extent of the powers of the corporation of New Orleans, provides that, " in default of payment of the said taxes, within the period which shall be prescribed by the City Council, the Mayor, &c., are hereby authorized to bring suit, before any

and, while they ultimately simplified our jurisprudence, produced perplexing difficulties in the comparison of the old with the more recent enactments. The Code of Practice, especially, was a most perplexing innovation.    The task imposed upon the Court was performed with discrimination and ability.    It was also during that period that the most important decisions were rendered on questions of the conflict of laws, and that branch of international jurisprudence was greatly illustrated by the labors of the Supreme Court of Louisiana. It cannot be expected that this notice of the deceased should furnish anything like an analysis of those decisions, but it is proper to say that Judge PORTER devoted the whole energies of his mind to the discharge of his official duties, and was remarkable for the full and able development of every question he was called upon to discuss.

In December, 1833, he was elected a Senator in the Congress of the United States, and resigned his seat on the Bench.    He was far from being one of those politicians by trade, who have an eternal, morbid hankering after office, and who are always thrusting themselves forward whenever any office becomes vacant, which their selfish ambition suggests to them to solicit.    On the contrary, his views were liberal and enlarged, and he entered the Senate with a high reputation already formed, as a jurist and a man, and he soon gave proof that he was a statesman of no ordinary stamp.    The Senate was at that time composed of the most eminent men in the nation, and it is enough to say, that he distinguished himself as an able and ready debater, even in a body composed of CLAY, WEBSTER, CALHOUN, PRESTON, CLAYTON, and a host of others. His career as a Senator, though brilliant, was not long.    Before the end of his term he retired from public life, and devoted himself to literary and agricultural pursuits, until he was again elected to the Senate in January, 1843, without any solicitation on his part, and even in his absence from the seat of government.    Under this new appointment he never took his seat.    A disease, which his friends have always attributed to the severe labors of the Bench, terminated ultimately in *hydrothorax*, which put an end to his earthly career on the 13th of January last.

There are few examples of men like ALEXANDER PORTER, who, by the unaided energies of their own minds, triumphant over the disadvantages of early fortune, and in a foreign land, without the aid of family connections, emphatically artificers of their own fortunes, have so eminently adorned the land of their adoption, and more than repaid the debt of gratitude to the country by which they were so generously received, honored and beloved.

court of competent jurisdiction, against all who are in default for said taxes, together with eight per cent interest on the amount thereof, from the day on which the same fell due, or ought to have been paid." B. & C. Dig., p. 118. In December, 1838, the Municipal Council passed an ordinance directing the treasurer, on the first day of January in each year, "to commence the collection of the taxes for the past year, after giving ten days previous notice in two of the newspapers of the city, in English and French; and that he institute suits against all persons who fail to pay said taxes within ten days after notification, for the amount of the tax, including interest at the rate of eight per cent per annum, from the date of notification." The statute and ordinance clearly contemplate a notice to the tax payer, before he is made liable for interest at the rate of eight per cent per annum. The statute provides that suits may be instituted "against all who are in default for said taxes," together with interest, &c. The ordinance declares that the treasurer must give ten days previous notice of his commencing to collect the taxes, and that he shall institute suits against all who fail to pay within ten days after notification, for the amount of the tax and interest from the date of the notification. In this case there is no evidence of a notification, in the newspapers, or in any other mode. The tax payer has not been put in default, and is not liable for the interest, at the rate claimed, until the institution of this suit.

It is, therefore, ordered, that the judgment of the Commercial Court be annulled, and that the Second Municipality do recover of the Orleans Cotton Press Company the sum of $1500, with interest thereon, at the rate of eight per centum per annum, from the ninth day of December, 1841, the day of judicial demand, until paid; and also the sum of sixteen dollars, the amount of interest, at the rate aforesaid, on the sum of $600, from the date of judicial demand until the time said sum was paid; the appellee paying the costs in this court, and those of the court below to be paid by the appellant.